UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARBI KAMALI,<br><br>                    Plaintiff,<br><br>          v.<br><br>ROSE STEVENS, *et al.*,<br><br>                    Defendants. | Case No. 1:19-cv-01432-JLT-HBK<br><br>FINDINGS AND RECOMMENDATIONS TO GRANT IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT[1]<br><br>FOURTEEN-DAY OBJECTION PERIOD<br><br>(Doc. No. 58) |

This matter was reassigned to the undersigned on July 3, 2025. (Doc. No. 69).  Pending before the Court is Defendants' Motion for Summary Judgment filed April 17, 2023.  (Doc. No. 58, "MSJ").  For the reasons set forth below, the undersigned recommends that the District Court deny Defendants' exhaustion-based motion for partial summary judgment as to Defendants Bryan and Hernandez excessive use of force claim but otherwise grant Defendants' MSJ on Plaintiff's excessive force and retaliation claims, enter judgment in favor of Defendants, and close this case.

## I.  BACKGROUND

### A.  Procedural History and Allegations in Operative Complaint

On December 2, 2019, Plaintiff initiated this action while confined at California Department of Corrections and Rehabilitation ("CDCR").  (Doc. No. 1).  After the initial

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2023).

screening, Plaintiff filed his First Amended Complaint ("FAC") on February 27, 2020.  (Doc. Nos. 11, 13).

In relevant part, the FAC alleges that on January 21, 2018, at approximately 2:00 p.m., Plaintiff was at Kern Valley State Prison's ("KVSP") C-Visiting processing area when Defendant Stevens asked Plaintiff to submit to an x-ray after visiting hours had concluded.  (Doc. No. 13 at 3). When instructed to undergo a pat-down search, Plaintiff got down on the floor with his hands positioned beneath his chest.  (*Id*.).  Nonparty Officer Solis and Defendant Villegas allegedly jumped onto Plaintiff's back to handcuff him, and Defendant Stevens began kicking Plaintiff in the head and forehead, then knelt and punched him in the face.  (*Id*. at 3–4). Defendant Villegas then allegedly withdrew a metal baton and struck Plaintiff on the right side of his head approximately ten times, causing Plaintiff to lose consciousness.  (*Id*. at 4).

When Plaintiff regained consciousness, he was in handcuffs and leg restraints with Defendant Bryan slapping him.  (*Id*.).  Defendants Bryan and Hernandez continued to strike Plaintiff while yelling "stop resisting," to which Plaintiff responded that he was not resisting and was already restrained.  (*Id*. at 4, 6).  Defendant Bryan then allegedly slammed Plaintiff headfirst into the floor, and Defendant Alen Hernandez kicked Plaintiff three to four times on the left side of his face and ear, resulting in permanent hearing loss and active bleeding. (*Id*. at 6).  Finally, Defendant Stevens deployed pepper spray to Plaintiff's face immediately before the alarm was activated.  (*Id*.).  Plaintiff alleges this second beating lasted more than fifteen minutes.  (*Id*. at 7).

Finally, Plaintiff alleged that Defendants Stevens, Villegas, Bryan, and Hernandez warned him that he would be subject to bodily harm if he told the truth about his injuries from Defendants beating him up. (Doc. No. 13 at 5, 9:3-10, 11:2-3,5-6).

On July 26, 2021, the previously assigned magistrate recommended that the case proceed only on Plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims against Correctional Officers Rose Stevens, Ivan Villegas, Jordan Bryan, and Alen Hernandez, dismissing all other claims for failure to state a claim.  (Doc. No. 15 at 17-18). The District Court adopted these recommendations in full on September 17, 2021.  (Doc. No. 16).

On January 24, 2022, Defendants filed a motion for judgment on the pleadings, arguing

2

that Plaintiff's claims were barred by *Heck v. Humphrey*, 512 U.S. 477 (1994) because Plaintiff was found guilty of "Battery Causing Serious Injury" in a prison disciplinary hearing based on the same January 21, 2018 incident and lost 360 days of behavioral credits.  (Doc. No. 37; Doc. No. 37-1).  On August 9, 2022, the previously assigned magistrate recommended denial of the motion, applying the "break" theory from *Hooper v. County of San Diego*, 629 F.3d 1127 (9th Cir. 2011),  finding that Plaintiff's allegations supported a temporal separation between his initial resistance and the subsequent alleged excessive force after he regained consciousness.  (Doc. No. 49 at 12-13).

On September 30, 2022, the District Court adopted the magistrate's recommendations in part and granted in part and denied in part Defendants' motion for judgment on the pleadings after conducting de novo review.  (Doc. No. 52).  Applying *Lemos v. County of Sonoma*, 40 F.4th 1002 (9th Cir. 2022), the District Court granted Defendants' motion "as to claims premised upon the initial altercation," and that "Plaintiffs claims may proceed only as to the 'post-break' conduct" because any claim based upon Defendants' alleged acts or misconduct against Defendants Villegas and Solis[2] prior to Plaintiff regaining consciousness in handcuffs "are barred by *Heck*." (Doc. No. 52 at 7-8).

Thus, procedurally this case proceeds on Plaintiff's First Amendment retaliation claims and Eighth Amendment excessive force claims against Defendant Jordan Bryan, Alen Hernandez, and R. Stevens based solely on alleged "post-break" conduct occurring after Plaintiff regained consciousness while restrained.

### B. Applicable Pleadings

#### 1.    Defendants' MSJ

Supporting their MSJ, Defendants submit: (1) a memorandum of points and authorities (Doc. No. 58-2); (2) a statement of undisputed material facts (Doc No. 58-1); (3) the declaration of A. Hernandez (Doc No. 58-4); (4) the declaration of Howard Moseley (Doc No. 58-5); (5)

---

[2] Notably, Solis was not named as a Defendant. Instead, Plaintiff's initial altercation named Villegas and Stevens as Defendants.  And it was Defendant Stevens, not Villegas who sustained a broken wrist in the initial altercation. (*See* Doc. No. 52 at 5:16-23, 6:18-21).

Declaration of I. Villegas (Doc No. 58-6); (6) the declaration of J. Bryan (Doc No. 58-7);  (7) the declaration of Jason Barba (Doc No. 58-8); (8) the declaration of Joshua Johnson (Doc No. 58-9); (9) the declaration of M. Solis (Doc No. 58-10); and (10) the declaration of R. Stevens (Doc No. 58-11).

Defendants assert four principal grounds for summary judgment.  First, Defendants argue that Plaintiff failed to exhaust administrative remedies as required by the PLRA.  (Doc. No. 58-2 at 14–16).  While Kamali filed a grievance against Defendants Stevens and Villegas for force used during the initial altercation, he did not submit any grievance identifying Defendant Bryan or Hernandez or describing post-restraint misconduct.  (*Id*.).

Second, Defendants contend that the undisputed facts show no constitutional violation. (*Id*. at 12–17). They assert that any force used was a good-faith effort to restore order in response to Kamali's ingestion of methamphetamine and physical resistance and that Plaintiff's "post-break" allegations concerning the excessive use of force are either unsupported or contradicted by the record.  (*Id*.).

Third, Defendants argue that Kamali's retaliation claims fail for lack of protected conduct, causal connection, and chilling effect.  (*Id*. at 18–21). They assert that Kamali's allegations are speculative and inconsistent, and that their actions in using force on the day of the incident were motivated by legitimate correctional goals.  (*Id*.).

Finally, Defendants assert entitlement to qualified immunity, arguing that no clearly established law prohibited their conduct under the circumstances.  (*Id*. at 21–23).

### 2.  Plaintiff's Opposition to Defendants' MSJ

On May 8, 2023, Plaintiff filed his Opposition.  (Doc. No. 60).  In support, he submits (1) a response, challenging sixteen of Defendants' undisputed facts (*id*. at 1–6), and (2) numerous exhibits in support of his response to Defendants' undisputed facts which predominately include incident reports, grievances, and medical documents (*id*. at 7–44).  Plaintiff did not file a memorandum of points or authorities.

### C.      Undisputed Material Facts

Defendants provide a statement of undisputed material facts.  (Doc. No. 58-2).  Each

listed fact cites to sworn declarations, deposition testimony, and the FAC. (*See* generally *id*.).

In his opposition, Plaintiff contests 16 of Defendants' material facts listed in their statement of undisputed material facts. (Doc. No. 60 at 1–6). Plaintiff's disputes primarily target the factual findings of the Rules Violation Report (RVR), specifically denying that he exposed staff to methamphetamine, resisted attempts to detain him, or caused injuries to the Defendants. (*See id.*). However, Plaintiff's fails to provide declarations, medical records, or any other evidence to support his version of events. Apart from these 16 facts, Plaintiff concedes that the remaining facts are undisputed. (*Id*. at 1). Where Plaintiff's response to Defendants' statement of undisputed facts is based solely on conclusory statements and lacks detailed facts or adequate evidence, while Defendants provide detailed facts supported by a sworn declaration or documentary evidence, the Court generally does not find Plaintiff's objections sufficient to establish a genuine dispute of material fact. *See Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc); *see also FTC v. Publishing Clearing House*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). Having reviewed the record, the undersigned finds the following facts to be material and undisputed, unless otherwise noted.

- Plaintiff Kamali was housed at Kern Valley State Prison in January 2018. (Doc. No. 13 at 2).

- On January 21, 2018, Defendant-Officer Stevens was assigned to the Low Dose Body Scanner machine in the Facility C visiting area. (Doc. No. 13 at 3; Doc. No. 58-11 at 2-3 ¶¶ 3-4; Doc. No. 58-6 at 2 ¶ 3; Doc. No. 58-10 at 2 ¶ 3).

- Defendant-Officer Villegas and nonparty Officer Solis worked alongside Officer Stevens in the Facility C inmate processing room. (Doc. No. 13 at 3; Doc. No. 58-11 at 2-3 ¶ 4; Doc. No. 58-6 at ¶ 3; Doc. No. 58-10 at 2 ¶ 3).

- The inmate processing area is adjacent to the visiting area. In the inmate processing area, there are holding cells where inmates wait to be called to pass through a Low Dose Body Scanner, which is used to ensure that inmates are not bringing into the prison controlled substances or contraband that they may have received from visitors. (Doc. No. 58-11 at 2

5

¶ 3; Doc. No. 58-6 at ¶ 3; Doc. No. 58-10 at 2 ¶ 3).

• On January 21, 2018, while in the Facility C visiting area at Kern Valley State Prison, Kamali procured two bundles of methamphetamine that he hid in the back pockets of his clothing. (Doc. No. 58-9 at 3-167 ("Kamali Depo. Tr.") at 101:12-22; 115:11-116:8).

• Around 2:00 p.m. on January 21, 2018, which was shortly after visiting hours ended, Kamali proceeded to the Facility C inmate processing room with the two bundles of methamphetamine still in his clothing. (Kamali Depo. Tr. at 108:16-25).

• Officer Stevens called Kamali to pass through the body scanner before returning to his housing unit. Officer Stevens monitored the body scanner screen. (Doc. No. 13 at 3; Doc. No. 58-11 at 2-3 ¶ 4; Doc. No. 58-6 at 2 ¶ 4; Doc. No. 58-10 at 2 ¶ 4).

• As directed by Officer Stevens, Kamali stepped into the body scanner and was scanned. (Doc. No. 13 at 3; Doc. No. 58-11 at 2-3 ¶ 4; Doc. No. 58-6 at 2 ¶ 4; Doc. No. 58-10 at 2-3 ¶ 5).

• In reviewing the body scanner monitor, Officer Stevens observed two suspicious objects near Kamali's buttocks area. The objects were round, similar to balloons used to bring illegal drugs into the prison, with one on each buttock. (Doc. No. 58-11 at 3 ¶ 5; Doc. No. 58-10 at 2-3 ¶ 5).

• Officers asked Kamali to step down from the body scanner so that Officer Solis could do a pat down search. (Doc. No. 13 at 3; Doc. No. 58-11 at 3 ¶ 6; Doc. No. 58-10 at 2-3 ¶ 5-6).

• Officer Stevens asked Kamali if he had any concealed contraband. Kamali said he did not. (Kamali Depo. Tr. at 114:5-9; Doc. No. 58-11 at 3 ¶ 6; Doc. No. 58-10 at 3 ¶ 6).

• It is prison policy to ensure that inmates returning from visiting do not have any foreign objects on their person and, if they do, to remove them before they can be released back to Facility C. Drugs and contraband cause serious health and safety concerns for both inmates and prison staff. (Doc. No. 58-11 at 3 ¶ 6; Doc. No. 58-6 at 3 ¶ 6; Doc. No. 58-10 at 3 ¶ 7).

• Kamali has a history of drug use in prison. His drugs of choice are methamphetamine and heroine. Kamali also has a history of selling methamphetamine while in prison. It is a

6

violation of CDCR regulations for an inmate to possess controlled substances. (Kamali Depo. Tr. at 54:18-55:20; Cal. Code Regs., tit. 15, § 3016).

- An inmate's possession of methamphetamine in prison is a serious health, safety, and security concern for inmates and prison staff because, among other issues, inmates on methamphetamine do not sleep, become paranoid, can overdose, get into fights, act in ways they normally would not, and may contract disease. (Kamali Depo. Tr. at 55:15-58:23; Doc. No. 58-11 at 3 ¶ 6; Doc. No. 58-6 at 3 ¶ 6; Doc. No. 58-10 at 3 ¶ 3).

- Kamali then grabbed the bundles of methamphetamine from his clothing and pulled his arms to his chest and ripped the bundles open. (Kamali Depo. Tr. at 114:10-17; Doc. No. 58-11 at 3-4 ¶ 7-10; Doc. No. 58-6 at ¶ 5-8; Doc. No. 58-10 at 3 ¶ 8).

- Kamali dropped down to the ground with his arms under his chest and began to ingest as much of the methamphetamine as he could. (Kamali Depo. Tr. at 114:10-118:3; Doc. No. 58-11 at 4 ¶ 8; Doc. No. 58-6 at 3-4 ¶ 7-8; Doc. No. 58-10 at 3-4 ¶ 9).

- Kamali ingested more methamphetamine in that moment than he has ever ingested in one sitting. (Kamali Depo. Tr. at 118:1-7).

- With the bundles of methamphetamine open, Kamali scattered it about while trying to eat it. In the process, Officers Villegas and Solis were exposed to methamphetamine, making it hard for them to see and breathe. The methamphetamine got into the eyes and mouths of Officers Villegas and Solis. (Doc. No. 58-11 at 4 ¶ 10 ("tear the blue bindles apart . . . Kamali eating the white powder"); Doc. No. 58-6 at 4 ¶ 8 ("flinging the powdery substance into the air"); Doc. No. 58-10 at 4 ¶ 9-10). Plaintiff disputes that he scattered the methamphetamine and that Officer Villegas and Solis were exposed to methamphetamine. (Doc. No. 60 at 2, 10-11). Kamali fails to provide medical evidence, or lab reports to contradict the Officers' declarations, the RVR findings, and the incident report which establishes that the substance was flung into the air during the struggle thereby exposing Defendants to methamphetamine. (Doc. No. 60 at 10-11, Ex. B); Doc. No. 58-11 at 4 ¶ 10-12; Doc. No. 58-6 at 4 ¶ 8; Doc. No. 58-10 at 4 ¶ 9-10; Doc. No. 60 at 8, Ex. A; Doc. No. 60 at 10-11, Ex. B). Kamali wanted the officers to spray him so that

7

the pepper spray would dissolve the methamphetamine.  He was disappointed that the officers did not spray him right away.  (Kamali Depo. Tr. at 118:6-119:2).

- Nonparty Solis grabbed Kamali's left arm and Officer Villegas grabbed Kamali's right arm to prevent Kamali from continuing to consume the methamphetamine.  (Kamali Depo. Tr. at 121:19-122:4; Doc. No. 58-11 at 3-4 ¶¶ 6-7; Doc. No. 58-6 at 3 ¶ 5; Doc. No. 58-10 at 3-4 ¶ 9).

- Officers Villegas and Solis got down on Kamali's back to hold Kamali down to try to gain control of his arms.  (Kamali Depo. Tr. at 123:14-124:1; Doc. No. 58-11 at 4 ¶ 9; Doc. No. 58-6 at 3 ¶ 5; Doc. No. 58-10 at 3-4 ¶ 9-10).

- Kamali thrashed his torso and elbows and kicked his legs to throw off Officers Villegas and Solis.  (Kamali Depo. Tr. at 124:21-125:3; Doc. No. 58-11 at 4 ¶¶ 9-11; Doc. No. 58-6 at 4 ¶ 8; Doc. No. 58-10 at 4 ¶ 10).  Kamali disputes this fact, specifically that he was thrashing and kicking.  (Doc. No. 60). This dispute is contradicted by Defendants' declarations.  Doc. No. 58-11 at 4 ¶ 9; Doc. No. 58-6 at 4 ¶ 8; Doc. No. 58-10 at 4 ¶ 9-10).Officers ordered Kamali to stop resisting and to give them his hands to be handcuffed, but Kamali refused to comply.  (Kamali Depo. Tr. at 124:21-125:3; Doc. No. 58-11 at 4 ¶ 11; Doc. No. 58-6 at 4 ¶ 9; Doc. No. 58-10 at 4 ¶ 10).  Kamali disputes that he was resisting in his Opposition.  (Doc. No. 60).  However, Kamali admits this fact in his deposition by stating he was trying to eat the meth was not complying with order so officers would spray him.  (Kamali Depo. Tr. at 119:9-120:7).Kamali struck Officer Villegas on the lower left side of his mouth with his elbows.  (Doc. No. 58-6 at 4 ¶¶ 8, 11; *id.* at 8).  Plaintiff disputes this and denies he caused swelling or bruising to Villegas.  (Doc. No. 60).  This dispute is contradicted by Defendants' declarations, medical evaluations, and the RVR.   (Doc. No. 58-11 at 4 ¶ 10-; Doc. No. 58-6 at 4 ¶ 8; Doc. No. 37-1 at 6-77).

- Officer Stevens placed a knee on Kamali's back and tried to use her strength and body weight to hold Kamali's head down to keep him from thrashing it.  While thrashing about, Kamali caused Officer Stevens' left hand thumb and wrist to be pulled back to the point

8

that the wrist fractured. (Doc. No. 58-11 at 1, 4-6, ¶¶ 1,11, 15; id. at 15). Kamali disputes his actions caused the fracture. (Doc. No. 60). This dispute is contradicted by the finding in the RVR. Further, Plaintiff fails to provide any evidence to support this fact. (Doc. 58-8 (referencing the RVR at Doc. No. 37-1 at 6)

- Officer Stevens ordered Kamali to stop resisting and warned that she would spray him; Kamali continued to resist and eat the methamphetamine. (Doc. No. 58-11 at 4 ¶ 11; Doc. No. 58-6 at 4 ¶ 9; Doc. No. 58-10 at 4 ¶ 10).

- Officer Stevens sprayed Kamali in the facial area with OC pepper spray. (Doc. No. 58-9 at 180; Kamali Depo. Tr. at 133:5-6; Doc. No. 58-11 at 4-5 ¶ 12; Doc. No. 58-6 at 4 ¶ 9; Doc. No. 58-10 at 4 ¶ 10).

- After being sprayed with OC pepper spray, Kamali began to spit out the methamphetamine and pepper spray, but he did not stop resisting. (Doc. No. 58-11 at 4-5 ¶ 12; Doc. No. 58-6 at 4 ¶ 9; Doc. No. 58-10 at 4 ¶ 10).

- While Kamali continued to resist, Officers Villegas and Solis managed to get his hands out from under his belly and to move them toward his back. (Doc. No. 58-6 at 4 ¶ 10; Doc. No. 58-10 at 4 ¶ 11).

- Officer Villegas activated his personal alarm to call for backup. (Doc. No. 58-6 at 3 ¶ 7).

- Numerous officers responded to the alarm in the Facility C visiting processing area at approximately 2 p.m., with Correctional Officer Bryan arriving first. (Kamali Depo. Tr. at 138:10-15; Doc. No. 58-11 at 5 ¶ 13; Doc. No. 58-6 at 4 ¶ 10; Doc. No. 58-10 at 4 ¶ 12).

- Officer Bryan took Officer Stevens's place. (Doc. No. 58-11 at 5 ¶ 13; Doc. No. 58-10 at 4 ¶ 1; Doc. No. 58-7 at 2 ¶¶ 3-4).

- Officer Stevens stepped away to make a call to stop Kamali's visitors from leaving. (Doc. No. 58-11 at 5 ¶ 13).

- Officer Bryan handcuffed Kamali while Officers Villegas and Solis held his arms. (Doc. No. 58-10 at 4 ¶ 12; Doc. No. 58-6 at 4 ¶ 10; Doc. No. 58-7 at 2-3 ¶¶ 4-5).

- Officer Hernandez arrived and, after Kamali was in handcuffs, Officer Hernandez secured Kamali in leg restraints. (Doc. No. 58-4 at 2 ¶¶ 4-5).

9

- Kamali does not remember when he was handcuffed, just that at some point he was in handcuffs.  (Kamali Depo. Tr. at 133:10-15).
- After Kamali was handcuffed and in leg restraints, he stopped resisting and was compliant.  (Doc. No. 58-10 at 4 ¶ 12; Doc. No. 58-4 at 3 ¶ 6; Doc. No. 58-7 at 3 ¶ 5).
- With Kamali in handcuffs, there was no further use of force from the officers.  (Doc. No. 58-10 at 4 ¶ 12; Doc. No. 58-6 at ¶ 10; Doc. No. 58-4 at 3 ¶ 6; Doc. No. 58-7 at 3 ¶ 5).
- Immediately after, Kamali was taken to the Facility C medical clinic and evaluated.  (Doc. No. 58-4 at 3 ¶ 7; Doc. No. 58-7 at 3 ¶¶ 6-7; *id*. at 7).
- Medical staff observed that Kamali had a cut/laceration above his left eye, and red areas on his face.  (Kamali Depo. Tr. at 147:20-148:13).
- When at the Facility C medical clinic on January 21, 2018, Kamali told the Facility C medical staff that he fell off his bunk bed.  (Doc. No. 13 at 11; Doc. No. 58-9 at 170).
- Facility C Medical staff sent Kamali to Delano Regional Medical Center for a CT Scan.  (Doc. No. 13 at 11).
- The results of the CT Scan of Kamali were normal.  (Kamali Depo. Tr. at 150:1-5).
- Officers Villegas, Solis, and Stevens were taken to the Facility C medical clinic for evaluation due to injuries sustained from Kamali and exposure to methamphetamine in the air.  (Doc. No. 58-11 at 5 ¶ 14; *id*. at 12; Doc. No. 58-6 at 4 ¶ 11; *id*. at 8; Doc. No. 58-10 at 4 ¶ 13; *id*. at 10).  Plaintiff disputes that any officer injuries were caused by him or by methamphetamine exposure.  (Doc. No. 60).  Plaintiff's dispute is contradicted by the RVR findings.  (Doc. No. 58-10 at 5 ¶ 15; Doc. No. 37-1 at 6)
- On January 24, 2018, three days after the incident, Kamali does not recall Facility C medical staff reevaluating Kamali and Nurse Mendez reporting that he had no visible injuries.  (Kamali Depo. Tr. at 157:24-158:16).
- On January 21, 2018, Officer Solis was taken to the prison medical clinic where he was found to have abrasions and redness on his left knee.  (Doc. No. 58-10 at 4 ¶ 13; *id*. at 10).
- On January 21, 2018, Officer Villegas was taken to the prison medical clinic for evaluation due to being exposed to the methamphetamine.  (Doc. No. 58-6 at 4-5 ¶ 12; *id*.

at 8-24).  Plaintiff disputes that Villegas was exposed to methamphetamine.  (Doc. No. 60).  Plaintiff offers no evidence to contradict Officer Villegas' sworn declaration regarding his symptoms and exposure.  (Doc. 58-6 at 4 ¶ 8).

- On January 25, 2018, Officer Stevens discovered her left wrist was fractured after she tried to use her weight and force trying to keep Kamali down.  (Doc. No. 58-11 at 1, 4-6, ¶¶ 1,11, 15; *id*. at 15).  Plaintiff disputes the wrist was fractured due to the incident with him.  (Doc. No. 60).  Plaintiff fails to provide any alternative cause or medical evidence to rebut the evidence that the fracture occurred during the struggle to restrain him or to rebut the RVR finding and sworn declaration of Officer Stevens.  (Doc. 58-11 at 6 ¶ 17).

- On February 11, 2018, just over two weeks after the incident, Kamali wrote a letter to the California Inspector General alleging that Officers Stevens and Villegas used excessive force on him while he was eating "contraband;" he made no mention of Officers Bryan or Hernandez or any alleged misconduct after the alarm sounded.  (Doc. No. 58-9 at 170-171).

- On February 12, 2018, Kamali submitted Inmate Grievance Log No. KSVP-18-00412 ("Grievance"), alleging excessive force by Officers Villegas, Stevens and unidentified responding staff from SNE in retaliation for his consumption of "alleged unlawful contraband" on January 21, 2018, while in the x-ray area.  (Doc. No. 58-5 at 11).  The Grievance states "[t]he named officers punched [ ], kicked, stomped [ ], [and] struck me with [ ] metal batons while yelling 'STOP RESISTING[.]' . . . I even lost consciousness at some point [during] the assault."  (*Id*. at 11, 13).  Although the Grievance does not mention any of the "responding officers" by name, including Bryan or Hernandez, (*see id*. at 9-72), it asserts that "[o]nce all the responding staff arrived at the scene, I was yet [again] punched, harassed, and threatened by" correctional staff.  (*Id*. at 13).  Under the "Action Requested" section of the Grievance, Plaintiff requests that "all named and involved correctional staff be dismissed from their correctional duties for excessive force and threats upon an inmate."  (*Id*. at 12).  The March 2018 Second Level Response indicates that Plaintiff was interviewed earlier that same month, and asked whether he

11

could "identify any other staff members involved in this incident with the exception of Officers R. Stevens and I. Villegas." (*Id*. at 16). He answered, "No, I am not able to. I was knocked out." (*Id*.). In exhausting his administrative remedies, the July 2018 Third Level Appeal Decision summarized Kamali's position as follows: Officers "J. Villegas, R. Stevens, and responding staff utilized excessive force against his person" in retaliation for his eating "alleged unlawful contraband." (*Id*. at 9). Plaintiff asserts this grievance mentions "responding SNE," which encompasses Officers Bryan and Hernandez. (Doc. No. 60).

- On January 21, 2018, Officer Long took photographs of Kamali and Officers Solis, Villegas and Stevens shortly after Kamali was restrained and responding staff arrived to process the scene. (Doc. No. 58-11 at 5 ¶ 16; *id*. at 17-29; Doc. No. 58-6 at 4-5 ¶ 12; *id*. at 10-24; Doc. No. 58-10 at 5 ¶ 15; *id*. at 15-24).

- As a result of the January 21, 2018 incident, Kamali was found guilty of battery causing serious injury. (Kamali Depo. Tr. at 158:17-160:8; Doc. No. 52 at 3; Doc. No. 37-1 at 11, 16).[3] Plaintiff disputes the finding of guilt for causing serious injury to Stevens. (Doc. No. 60). Defendants provide as evidence the RVR findings. (Doc. No. 37-1 at 6).

- The findings for Rules Violation Report Log No. 000000004271824 state that Kamali struck Officer Villegas on the lower left side of his mouth with his elbows and that Officer Stevens sustained a fractured wrist during the altercation with Kamali. (Doc. No. 37-1 at 16). Plaintiff disputes striking Villegas and causing Stevens' fracture. (Doc. No. 60).

---

[3] Defendants cite an exhibit that is not attached to their instant motion, which references Rules Violation Report ("RVR"), Log No. 4271824. (*See* Doc. No. 58-8). The undersigned notes that the RVR, Log No. 4271824, was discussed at length in the District Judge's order partially adopting the previously assigned magistrates' findings and recommendations and holding that any of Plaintiff's claims premised upon "pre-break" conduct are barred by *Heck*. (*See* Doc. No. 52). The District Court reasoned that "the Court should independently examine the entire record of the underlying disciplinary case to determine 'which facts the [finder of fact] necessarily found.'" (*Id*. at 6 (quoting *Lemos v. Cnty. of Sonoma*, 40 F.4th 1002, 1006 (9th Cir. 2022))). As the District Court explained, "Plaintiff was charged in a Rules Violation Report with violating Rule 3005(d)(1) of Title 15 of the California Code of Regulations, which prohibits inmates from committing assault and battery. Specifically, Plaintiff was charged with [and found guilty of] 'Battery Causing Serious Injury' in connection with an incident that took place on January 21, 2018." (Doc. 52 at 3 (citing Doc. No. 37-1 at 11, 16)). As mandated by *Lemos* and the honorable District Court, the undersigned considers RVR, Log No. 4271824 only to the extent necessary to determine whether Plaintiff's § 1983 claim and the RVR conviction rest on the same factual basis.

Defendants provide as evidence the RVR. (Doc. No. 37-1 at 6).

- The findings for Rules Violation Report Log No. 000000004271824 state that officers recovered 37.4 grams of methamphetamine from the scene, and that Kamali's actions caused Officer Villegas, Officer Solis and Officer Stevens to be exposed to methamphetamine. (Doc. No. 37-1 at 16). Plaintiff disputes the allegation of exposing officers to methamphetamine. (Doc. No. 60). Plaintiff's dispute is a bare denial that fails to overcome the weight of the evidence presented in the RVR and the officers' declarations. (Doc. No. 58-11 at 4 ¶ 10-12; Doc. No. 58-6 at 4 ¶ 8; Doc. No. 58-10 at 4 ¶ 9-10; Doc. No. 37-1 at 6)

- On January 8, 2019, Kamali wrote a second letter to the Office of the Inspector General. Kamali alleged that officers used force while he resisted and ate methamphetamine. There is no mention of handcuffs or leg restraints. Kamali stated that Officer Stevens sprayed his face with pepper spray prior to Officer Bryan and Hernandez responding to the scene. (Doc. No. 58-9 at 180).

- Kamali alleged in his deposition that Officer Stevens told him to keep his mouth shut, or else. Kamali confirmed at deposition that he did not know the motivation for Officer Stevens's alleged misconduct during the use-of-force incident. Officer Stevens never made any threats to silence him. Kamali never had any discussions with Stevens regarding prior grievances or other related first amendment activity. (Kamali Depo. Tr. at 25:20-24; 31:1-32:18).

- Kamali testified in his deposition that Officer Villegas told him to keep his mouth shut. Kamali confirmed at deposition that he did not know the motivation for Officer Villegas' alleged misconduct during the use-of-force incident. Kamali believed the reason the statement was made was because Kamali was not giving Officer Villegas his hands so that he could handcuff him. (Kamali Depo. Tr. at 35:12-22; 37:9-38:2).

- Kamali confirmed at deposition that he did not know the motivation for Officer Hernandez's alleged misconduct during the use-of-force incident. Kamali believed the reason the alleged statement was made was because of Officer Hernandez's alleged use of

13

force. (Kamali Depo. Tr. at 40:13-41:8).

- Kamali confirmed at deposition that he did not know the motivation for Officer Bryan's alleged misconduct during the use-of-force incident.  Kamali believed the reason the alleged statement was made was because of Officer Bryan's alleged use of force. (Kamali Depo. Tr. at 46:25-47:18).

## II.  Summary Judgment Standard

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Summary judgment should be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact. *Id.* at 323.  An issue of material fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there to be a genuine issue of a material fact. *See* Fed R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exists.  Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

14

*T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and showed judgment to be appropriate as a matter of law. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993). "[A] court ruling on a motion for summary judgment may not engage in credibility determinations or the weighing of evidence." *Manley v. Rowley*, 847 F.3d 705, 711 (9th Cir. 2017) (citation omitted). The evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002). A mere scintilla of evidence is not sufficient to establish a genuine dispute to defeat an otherwise properly supported summary judgment motion. *Anderson.*, 477 U.S. at 252. However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record" courts "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiff's verified complaint may serve as an affidavit in opposition to summary judgment if based on personal knowledge and specific facts admissible in evidence. *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc). However, a complaint's conclusory allegations unsupported by specific facts, will not be sufficient to avoid summary judgment. *Arpin v. Santa Clara Valley Transportation Agency*, 261 F.3d 912, 922 (9th Cir. 2001). And, where a plaintiff fails to properly challenge the facts asserted by the defendant, the plaintiff may be deemed to have admitted the validity of those facts. *See* Fed. R. Civ. P. 56(e)(2).

The undersigned has carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. The omission to an argument, document, paper, or objection is not to be construed that the undersigned did not consider the argument, document, paper, or objection. Instead, the undersigned thoroughly reviewed and considered the evidence it

15

deemed admissible, material, and appropriate for purposes of issuing these Findings and Recommendations.

### III.  APPLICABLE LAW AND ANALYSIS

#### A.  Exhaustion Under the PLRA

Defendants Bryan and Hernandez move for summary judgment based on Plaintiff's failure to exhaust his administrative remedies as to their alleged conduct through the prison's grievance process before filing suit.  (Doc. No. 58-2 at 9).

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The exhaustion requirement "applies to all inmate suits about prison life," including *Bivens* claims.  *Porter v. Nussle*, 534 U.S. 516, 524, 532 (2002).  Exhaustion is a condition precedent to filing a civil rights claim.  *Woodford v. Ngo*, 548 U.S. 81, 93 (2006).

The PLRA recognizes no exception to the exhaustion requirement, and the court may not recognize a new exception, even in "special circumstances."  *Ross v. Blake*, 578 U.S. 632, 648 (2016).  The one significant qualifier is that "the remedies must indeed be 'available' to the prisoner."  *Id.* at 639.  There are three circumstances where remedies are deemed unavailable:

> (1) the "administrative procedure . . . operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use . . . so that no ordinary prisoner can make sense of what it demands;" and (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Ross*, 578 U.S. at 643-44.  A prison's internal grievance process controls whether the grievance satisfies the PLRA exhaustion requirement.  *Jones v. Bock*, 549 U.S. 199, 218 (2007).

An inmate must exhaust available remedies but is not required to exhaust unavailable remedies.  *Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (*en banc*).  "To be available, a remedy must be available 'as a practical matter'; it must be 'capable of use; at hand.'"  *Id.* (quoting *Brown v. Valoff*, 422 F.3d 926, 936–37 (9th Cir. 2005)).  "Accordingly, an inmate is

16

required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)).

Failure to exhaust under the PLRA is "an affirmative defense the defendant must plead and prove." *Jones*, 549 U.S. at 204. It is the defendant's burden to prove that there was an available administrative remedy, and that the prisoner failed to exhaust that remedy. *Albino*, 747 F.3d at 1172. "Once the defendant has carried that burden, the prisoner has the burden of production. That is, the burden shifts to the prisoner to come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Id.* If the court concludes that the prisoner failed to exhaust available administrative remedies, the proper remedy is dismissal without prejudice. *See Jones*, 549 U.S. at 223–24; *Lira v. Herrera*, 427 F.3d 1164, 1175–76 (9th Cir. 2005).

The California Department of Corrections and Rehabilitation's ("CDCR") administrative remedy process governs this action.[4] *See* Cal. Code Regs. tit. 15, § 3084.1. To exhaust available remedies, an inmate must proceed through three formal levels of review unless otherwise excused under the regulations. *Id.* § 3084.5. A prisoner initiates the exhaustion process by submitting a CDCR Form 602 "Inmate/Parolee Appeal" ("grievance"). *Id.* §§ 3084.2(a), 3084.8(b) (quotation marks omitted). The grievance must "describe the specific issue under appeal and the relief requested," and the inmate "shall list all staff member(s) involved and shall describe their involvement in the issue." *Id.* § 3084.2(a). The inmate "shall state all facts known and available to him/her regarding the issue being appealed at the time of submitting the Inmate/Parolee Appeal Form, and if needed, the Inmate Parolee/Appeal Form Attachment." *Id.* § 3084.2(a)(4). If the inmate does not have information concerning the identity of the person at issue, he or she must provide any other available information that would assist the appeals coordinator in identifying

---

[4] Effective June 1, 2020, California Code of Regulations Title 15, sections 3084 through 3084.9 were repealed and replaced with renumbered and amended provisions at sections 3480 through 3487. *See Springs v. Raber*, 2022 WL 1004561, at *3 (S.D. Cal. Apr. 4, 2022). All the citations in this order are to the regulations in place in 2018, the relevant period for this action.

17

who is at fault. *Id*., § 3084.2(a)(3).

If dissatisfied with the first-level response, the prisoner must appeal to the second level. Like the first level appeal, the second level is handled by the institution. *Id*., § 3084.2(c). The appeal must be submitted within thirty calendar days of "[t]he occurrence of the event or decision being appealed," or "[u]pon first having knowledge of the action or decision being appealed," or "upon receiving an unsatisfactory department response to an appeal filed." *Id*., § 3084.8(b)(1)-(3).

After the second-level response, a dissatisfied prisoner must appeal to the third level of review. *Id*., §§ 3084.2(d), 3084.7(c), 3084.8(d). This review is handled by CDCR's Office of Appeals. *Id*., § 3084.2(d). The appeal must be served by mail to the Appeals Chief, again within thirty calendar days. *Id.* §§ 3084.2(d), 3084(b)(1)-(3). It is this third level of review that exhausts administrative remedies. *Id*., §§ 3084.1(b), 3084.7(d)(3).

The parties do not dispute that Kamali submitted an inmate grievance that was assigned Log No. KVSP-18-00412 on February 12, 2018, alleging that Officers Villegas and Stevens used excessive force "in retaliation from [Kamali] eating alleged unlawful inmate contraband." (Doc. No. 58-5 at 11). And Defendants do not challenge that Grievance 412 was exhausted through all three levels of administrative review. (*See* Doc. No. 58-5 at 9–72). The only contested issue is whether the assertions Plaintiff made in the Grievance adequately exhausted a claim for excessive use of force as to Defendants Bryan and Hernandez. (Doc. No. 58-2 at 14–16).

Defendants argue that Plaintiff's Grievance does not exhaust any claim against Defendants Bryan and Hernandez because it fails to mention either Defendant by name or sufficiently describe any alleged post-break misconduct. (*Id*. at 15–16). Thus, Defendants contend that the Grievance did not provide prison officials with notice of Plaintiff's use of force claims such that CDCR had an opportunity to remedy the alleged harm. (*Id*. at 16). By his opposition, Plaintiff argues that his Grievance does allege such a claim against these Defendants and contends that the term "responding staff" includes both Bryan and Hernandez. (Doc. No. 60 at 4–5).

"The grievance process is only required to alert prison officials to a problem, not to

18

provide personal notice to a particular official that he may be sued." *Reyes*, 810 F.3d at 659 (internal quotations and citation omitted). Grievance 412 asserts claims of excessive force against Officers Villegas, Stevens, "and Responding (SNE)" in retaliation for Plaintiff's consumption of contraband in "the x-ray area" on January 21, 2018. (Doc. No. 58-5 at 11, 13, emphasis added). Although the Grievance does not mention the responding officers by name, it asserts that after Officers Villegas and Stevens initially assaulted Plaintiff, and after "the responding staff" arrived on scene, Plaintiff was assaulted by correctional staff a second time shortly thereafter that same day. (*Id*. at 13, emphasis added). The Court finds that the plain language of Plaintiff's Grievance 412 provided sufficient notice, as it alerted CDCR "to the nature of the wrong for which redress is sought." *Sapp v. Kimbre*ll, 623 F.3d 813, 824 (9th Cir. 2010) (internal quotations and citation omitted). Thus, the Court finds that despite not specifically naming Defendants Bryan and Hernandez, Grievance 412 adequately put prison officials on notice of an Eighth Amendment use of force claim by the "responding officers," i.e. Defendants Bryan and Hernandez. Further, the second-level and third-level responses clearly indicate that prison officials were aware that additional prison staff responding to the January 21, 2018 incident may have participated in or been involved in the alleged excessive force, yet their identities were purportedly unknown to Plaintiff by reason of his physical incapacitation, presumably resulting from the use of force incident(s) at some point prior to the arrival of the responding officers. (*See* Doc. No. 58-5 at 9, 16). Thus, Defendants' lack-of-notice argument fails under these circumstances. *See Reyes*, 810 F.3d at 658 ("When prison officials opt not to enforce a procedural rule but instead decide an inmate's grievance on the merits, the purposes of the PLRA exhaustion requirement have been fully served[.]").

However, to the extent Plaintiff alleges a retaliation claim against Defendants Bryan and Hernandez for their alleged threats to assault Plaintiff if he informed anyone of how he received his injuries, such a claim is unexhausted and thus barred. A review of Plaintiff's grievance history (Doc. No. 58-5 at 9-14, Ex B) confirms that while he exhausted the claim that he was retaliated against for eating contraband, he failed to include any mention of subsequent threats intended to silence him. (*See* Doc. No. 13 at 5, 9:3–10, 11:2–3, 5–6) (finding Plaintiff first

19

amended complaint alleges retaliation claims against Defendants Bryan and Hernandez for their alleged threats to assault Plaintiff if he informed anyone of how he received his injuries). Because Grievance 412 is silent regarding these alleged threats, the prison was never provided with the sufficient information required to investigate or remedy that specific conduct.

Accordingly, the undersigned finds there is no genuine dispute as to whether Plaintiff exhausted his administrative remedies as to his Eighth Amendment excessive force claims and retaliation claims for eating illegal substances as to Defendants Bryan and Hernandez. The undersigned therefore recommends the District Court deny Defendants' exhaustion-based motion for partial summary judgment as to those claims, but grant the motion as to any retaliation claim predicated on alleged threats of bodily harm for informing others of the source of his injuries.

**B. Excessive Force**

Prison officials who use excessive force against an inmate violate his Eighth Amendment right to be free from cruel and unusual punishment. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002). "[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). When determining whether the force was excessive, the court looks to the "extent of injury suffered by an inmate . . . the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id*. at 7 (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)). While *de minimis* uses of physical force generally do not implicate the Eighth Amendment, significant injury need not be evident in the context of an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9.

"With regard to the use of pepper spray, the Ninth Circuit has concluded that the use of pepper spray 'may be reasonable as a general policy to bring an arrestee under control, but in a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would

20

know that a continued use of the weapon or a refusal without cause to alleviate its harmful effects constitutes excessive force.'" *Pinkston v. Fierro*, 2006 WL 3147685, at *6 (E.D. Cal. Nov. 1, 2006) (citing *See LaLonde v. County of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000)), *report and recommendation adopted*, 2007 WL 1365407 (E.D. Cal. May 9, 2007), *aff'd*, 315 F. App'x 628 (9th Cir. 2009); *see also Headwaters Forrest Def. v. Cnty. of Humboldt*, 276 F.3d 1125, 1130-31 (9th Cir. 2002) ("[I]t would have been clear to any reasonable officer that defendants' refusal to wash out the protesters' eyes with water constituted excessive force under the circumstances.").[5]

The District Court previously held that the "pre-break" conduct—all claims arising from the initial altercation—are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), leaving only those claims premised on the "post-break" conduct, which are alleged to have occurred once Plaintiff regained consciousness and awoke in restraints. (Doc. No. 52 at 7–8).

The undisputed record establishes that during the initial *Heck* barred altercation, Officer Solis and Villegas attempted to restrain Plaintiff to prevent him from continuing to consume large amounts of methamphetamine, while Plaintiff thrashed, elbowed, and kicked his legs. After refusing several orders to stop resisting, and after being warned that pepper spray would be administered if he continued to resist and consume methamphetamine, Officer Stevens then sprayed Plaintiff with OC pepper spray. Thus, contrary to the allegations in the complaint, Defendant Stevens sprayed Plaintiff with OC spray pre-break, not post-break. (Doc. No. 58-9 at 180; Kamali Depo. Tr. at 133:5-6; Doc. No. 58-11 at 4-5 ¶ 12; Doc. No. 58-6 at 4 ¶ 9; Doc. No. 58-10 at 4 ¶ 10). Indeed, in Kamali's letter dated January 8, 2019 to the Office of the Inspector General, he recalls eating the drugs to prevent Officer Stevens from arresting his girlfriend (who he had met with at visiting), and states that while eating the drugs, Officer Stevens sprayed him in the face with pepper spray. (Johnson Decl. Ex. D [Pl. 2019 Letter at pg. AGO154). At Kamali's deposition, when asked about the timeline of events, specifically when he recalled being handcuffed and sprayed, Kamali admitted that he did not remember when he was handcuffed and

---

[5] The standards applicable to use of force claims brought under the Fourth and Eighth Amendments are distinct. As evident by the cases cited here, however, judges in this District routinely apply principles derived from Fourth Amendment case law to Eighth Amendment claims filed by prisoners.

could not remember whether he was handcuffed or not at the time he was sprayed.  (DUF No. 37).

After being sprayed, Plaintiff did not cease resisting.  While Plaintiff continued to resist, Officer Villegas activated his personal alarm to call for backup, and he and Officer Solis managed to get Plaintiff's hands out from under his belly and move them toward his back.  In response to the alarm, Officer Bryan was the first officer to arrive at the Facility C visiting processing area, taking Officer Stevens's place.  Officer Bryan handcuffed Plaintiff, while Officers Villegas and Solis held his arms.  After Plaintiff was in handcuffs, Officer Hernandez arrived on scene and secured Plaintiff in leg restraints.  After Plaintiff was handcuffed and in leg restraints, he stopped resisting and was compliant.  With Plaintiff in handcuffs, there was no further use of force by the officers.

The undisputed material facts clearly established that once Plaintiff was in restraints, there was no further use of force by Officers Stevens, Bryan, Villegas, or Hernandez.  (Doc. No. 58-11 at 5 ¶ 13; Doc. No. 58-10 at 4 ¶ 12; Doc. No. 58-6 at ¶ 10; Doc. No. 58-4 at 3 ¶ 6; Doc. No. 58-7 at 3 ¶ 5).  Plaintiff does not remember when he was handcuffed, only that at some point he was in handcuffs.  (Kamali Depo. Tr. at 133:10-15).  Plaintiff did not raise an issue of material fact in his own filing, nor did he dispute the relevant facts in Defendants' statement of undisputed facts establishing that Defendants did not apply any force once Plaintiff was restrained.  (*Compare* Doc. No. 58-1 at 6, *with* Doc. No. 60 at 2-3).  Because there are no existing facts to support any "post-break" misconduct, all claims relating to the use of force fall under the "pre-break" conduct previously found by the District Court to be barred by *Heck*.

Plaintiff's FAC, opposition, and deposition testimony maintain that he never resisted, thrashed, kicked, or injured any officer on the day of the incident.  (Doc. No. 13 at 3-6; Doc. No. 60 at 2-6; Kamali Depo. Tr. at 125:16-25).  Plaintiff further disputes his finding of guilt related to his RVR stemming from the "pre-break" conduct and denies scattering and exposing Defendants to the methamphetamine he consumed and had attempted to smuggle into CDCR.  (Doc. No. 60 at 2-6).  Plaintiff's position appears to be "premised on the theory that any use of force was excessive because [he] was innocent of the rules violation for which he was convicted since he

22

did not commit battery." *See Stevenson v. Holland*, 2017 WL 2958731, at *7 (E.D. Cal. July 11, 2017) (citation omitted).  Because the events alleged in Plaintiff's pleadings and the findings of the RVR are "wholly inconsistent such that a finding in [his] favor would necessarily imply the invalidity of the RVR conviction," the undersigned finds that Plaintiff's use of force claims are barred by *Heck*.  *Id*.  Accordingly, the undersigned recommends that District Court grant Defendants' motion for summary judgment as to Plaintiff's excessive force claims.

Admittedly, "the fact that Plaintiff battered a correctional officer and refused orders from a correctional officer does not offer a blank check for use of force by correctional officers." *Stevenson v. Holland*, 2018 WL 1109707, at *8 (E.D. Cal. Mar. 1, 2018).  To the extent Plaintiff's pleadings and testimony can be interpreted as alleging that the level of force applied was disproportionate to the need to compel Plaintiff's compliance and does not necessarily undermine the validity of the RVR conviction, this argument nonetheless fails.  Plaintiff's assertion that he never resisted or injured any of the officers stands in stark contrast to the undisputed record as outlined *supra*.  Moreover, Plaintiff's testimony is riddled with inconsistencies and admissions.  For example, Plaintiff testified that during the "pre-break" conduct, prior to being handcuffed, he was not resisting but rather "just eating [the meth]. That's it."  (Kamali Depo. Tr. at 123:22-124:1).  Plaintiff further admits that when officers ordered Plaintiff to give them his hands, he refused the direct command because he "was still trying to eat the meth."  (Kamali Depo. Tr. at 124:21-125:3).  The Court recognizes that the evidence must be viewed "in the light most favorable to the nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr v. Bank of America*, NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  However, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record" courts "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, the Court finds Plaintiff's pleadings and testimony to be self-serving, inconsistent, contradicted by undisputed evidence in the record, or entirely without factual support to create a genuine issue of material fact sufficient to defeat summary judgment.  Thus, "insofar as Plaintiff suggests that no force was warranted because he did not defy the Defendant correctional officers'

orders, his claim is barred by *Heck*." *See Stevenson*, 2018 WL 1109707, at *7.

The undersigned finds that Plaintiff's claim for excessive force against all Defendants is intertwined with his underlying RVR for "Battery Causing Serious Injury" so that they are a part of the same continuum of force. *See Cunningham  v. Gates*, 312 F.3d 1148, 1151 (9th Cir. 2002) (finding plaintiff's claims were *Heck* barred when "there was no break between [the plaintiff s] provocative act of firing on the police and the police response that he claims was excessive")*; Blocker v. Solis*, 2023 WL 10479566, at *5 (C.D. Cal. Dec. 18, 2023) (finding that *Heck* barred plaintiff's § 1983 claim for excessive force because "acts underlying [p]laintiff's . . . conviction and [d]efendants' alleged acts of excessive force [we]re intertwined and [we]re not separated in time"), *adopted by* 2024 WL 1257431 (C.D. Cal. Mar. 25, 2024).

**C.  First Amendment Retaliation Claim**

The First Amendment guarantees a prisoner the right to file a grievance or access the courts. *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Brodheim v. Cry*, 584 F. 3d 1262, 1269 (9th Cir. 2009). Retaliating against an inmate for exercising this right is "prohibited as a matter of 'clearly established law." *Brodheim*, 584 F.3d at 1269 (citations omitted). To state a claim for First Amendment retaliation, a plaintiff must allege five elements: (1) he engaged in protected activity; (2) the state actor took an adverse action against the plaintiff; (3) a causal connection between the adverse action and the protected conduct; (4) the defendant's actions would chill or silence a person of ordinary fitness from protected activities; and (5) the retaliatory action did not advance a legitimate correctional goal. *Chavez v. Robinson*, 12 F.4th 978, 1001 (9th Cir. 2021) (quoting *Rhodes*, 408 F.3d at 567–68).

The adverse action must be of a sufficient nature that it would deter or "chill" a person of "ordinary firmness" in the exercise of his constitutional rights. *Rhodes v. Robinson*, 408 F.3d 559, 568-69 (9th Cir. 2005). The adverse action taken against the prisoner "need not be an independent constitutional violation.  The mere threat of harm can be an adverse action." *Watison*, 668 F.3d at 1114 (internal citations omitted).  A retaliatory motive may be shown by sufficiently convincing circumstantial evidence, as well as direct evidence.  *Bruce v. Ylst,* 351 F.3d 1283, 1288–89 (9th Cir. 2003); *McCollum v. Ca. Dep't of Corr. And Rehab*., 647 F.3d 870,

24

882 (9th Cir. 2011).  The causal connection between the adverse action and the protected conduct can also be inferred from the chronology of events.  *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  But, depending on the facts presented, mere timing of events may not be sufficient to establish causation.  *Id.*  And mere speculation that a defendant acted out of retaliation is not sufficient.  *Wood v. Yordy,* 753 F.3d 899, 904 (9th Cir. 2014) (citing cases).

In reviewing retaliation claims by a prisoner Courts must be mindful of avoiding "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'"  *Pratt*, 65 F.3d at 807 (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)).  Courts must "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  *Id.* (quoting *Sandin*, 515 U.S. at 482).  Consequently, courts are cautioned to "approach prisoner claims of retaliation with skepticism and particular care" lest "virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a conditional violation—can be characterized as a constitutionally proscribed retaliatory act."  *Bacon v. Phelps*, 961 F.3d 533, 543 (2d Cir. 2020) (quoting *Dawes v. Walker*, 239 F. 3d 489, 491 (2d Cir. 2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

Plaintiff alleges that Defendants use of excessive force against him was in retaliation for him eating meth; and thus violated his First Amendment rights.  (Doc. No. 13 at 5).  Plaintiff's retaliation claim fails to survive summary judgment for five reasons.

First, Plaintiff's retaliation claim fails at the threshold requirement of establishing causation. At his deposition, Plaintiff admitted he did not know the motivation for any of the Defendants' alleged use-of-force on the day of the incident.  (Kamali Depo. Tr. at 25:20-24; 31:1-32:18; 35:12-22; 37:9-38:2; 40:13-41:8; 46:25-47:18).  This admission is fatal to his claim, as he cannot establish the required "but-for" causation. *See Nieves v. Bartlett*, 587 U.S. 391, 399 (2019) (the plaintiff must establish "'but-for' causation," meaning "the adverse action against the plaintiff would not have been taken absent the retaliatory motive."); *see also Lacey v. Maricopa Cnty.*, 693 F.3d 896, 917 (9th Cir. 2012) (Plaintiff "must allege facts ultimately enabling him to

25

'prove the elements of retaliatory animus as the cause of injury.'").

Second, Plaintiff's account of the events has changed multiple times across different filings and testimony. Such inconsistencies, combined with Plaintiff's admission of not knowing Defendants' actual motivation, constitute exactly the type of "mere speculation" the Ninth Circuit has repeatedly rejected. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citing cases); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) ("A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation.").

Third, the undisputed evidence demonstrates that Plaintiff's own conduct—ingesting methamphetamine in prison while refusing lawful orders—is not a constitutionally protected activity. A prisoner has no constitutional right to consume illegal controlled substances while refusing officers' orders. *See* Cal. Code Regs. tit. 15, § 3016; *Blair v. CDCR*, 2020 WL 469334, at *3 (E.D. Cal. Jan. 29, 2020), *report and recommendation adopted* ("Inmate possession of controlled substances poses serious safety and security risks within the institution."), 2021 WL 1311445 (E.D. Cal. Apr. 8, 2021), *aff'd sub nom. Blair v. California Dep't of Corr. & Rehab.*, 2023 WL 3562965 (9th Cir. May 19, 2023).

Fourth, the undisputed facts establish that Defendants acted to preserve institutional order and security when confronting an inmate who had consumed illegal drugs and was refusing compliance with orders. "A prisoner suing prison officials under section 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action does not advance legitimate penological goals, such as preserving institutional order and discipline." *Barnett v. Centoni*, 31 F.3d 813, 815–16 (9th Cir. 1994). Courts must "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (internal quotation and citations omitted).

Finally, the Supreme Court "specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management, which often squanders judicial resources with little offsetting benefit to anyone." *Pratt*, 65 F.3d at 807 (cleaned up). This case presents

precisely the type of day-to-day prison management decision—responding to an inmate's consumption of illegal drugs and refusal to comply with orders—that warrants judicial deference to correctional officials' legitimate security concerns.

Accordingly, the undersigned recommends that District Court grant Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment retaliation claim.

### D. Qualified Immunity

In the alternative, Defendants assert that they are entitled to qualified immunity in this case because no official in their position would believe that their conduct violated Plaintiff's constitutional rights under the circumstances.

A government official is entitled to qualified immunity under Section 1983 unless (1) the official "violated a federal statutory or constitutional right, and (2) the unlawfulness of his conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982). To demonstrate that a right was "clearly established" requires a showing that the statutory or constitutional question was "beyond debate," such that every reasonable official would understand that what he is doing is unlawful. *Wesby*, 138 S. Ct. at 589; *Vos v. City of Newport Beach*, 892 F.3d 1024, 1035 (9th Cir. 2018). This standard is "demanding" and protects "all but the plainly incompetent or those who knowingly violate the law." *Wesby*, 138 S. Ct. at 589 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "[A] court typically should identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated the constitutional right at issue." *S.B v. County of San Diego*, 864 F.3d 1010, 1015 (9th Cir. 2017)). "Even when no case is 'directly on point,' courts may compare relevant factors to determine whether every reasonable officer should have known the conduct in question was unlawful." *Anderson v. Virga*, 2018 WL 1556806, *2 (E.D. Cal. Mar. 30, 2018) (citing *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 946–47 (9th Cir. 2017). The plaintiff bears the burden of establishing that the right alleged was clearly established. *Moran v. Washington*, 47 F.3d 839, 844 (9th Cir. 1998).

As discussed *supra*, the Court finds the undisputed facts show no Eighth or First

Amendment violation against any Defendant.  Thus, because the Court finds no constitutional violation, the Court need not address the second prong.

Accordingly, it is **RECOMMENDED**:

1. The District Court **GRANT IN PART** Defendants' motion for summary judgment (Doc. No. 58).

2. The District Court **DENY** Defendants' exhaustion-based motion for summary judgment as to Plaintiff's Eighth Amendment excessive use of force claim by the "responding officers," i.e.  Defendants Bryan and Hernandez and First Amendment retaliation related to the use of force for eating meth, but grant the motion as to any First Amendment retaliation claim predicated on alleged threats of bodily harm for informing others of the source of his injuries.

3. The District Court **GRANT** Defendants' merits-based motion for summary judgment as to Plaintiff's retaliation and excessive force claims.

4. Judgment be entered in Defendants' favor and the case closed.

### NOTICE TO PARTIES

These Findings and Recommendations will be submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after being served with a copy of these Findings and Recommendations, a party may file written objections with the Court.  *Id*.; Local Rule 304(b).  The document should be captioned, "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen (15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its CM/ECF document and page number, when possible, or otherwise reference the exhibit with specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. § 636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

These Findings and Recommendations are not an order that is immediately appealable to

28

the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.


Dated:    March 29, 2026

HELENA M. BARCH-KUCHTA
UNITED STATES MAGISTRATE JUDGE

29